ANGELA SUE Good morning, Your Honors. I'm Angela Sue on behalf of Petitioner. May it please the Court. THE COURT Please keep your voice up so we can pick it up. ANGELA SUE Yes, Your Honor. This case arises before this Court because of an adverse credibility determination rendered by Immigration Judge Rose Peters back in 1998 on a political asylum and withholding of removal grounds. Petitioner contends that that adverse credibility finding was flawed and is not supported by the evidence in the record. Judge Peters relied substantially upon generalized, nonspecific statements in the profile of asylum claims to contradict Petitioner's recounting of her personal suffering. For example, starting with the abortion certificates, Judge Peters relied on a generalized statement that the State Department was not aware of the existence of any abortion certificates. Not aware does not mean that they do not exist. The judge was speculating that not aware means that they do not exist, and that is impermissible and not a proper ground for an adverse credibility determination. Similarly, the judge's credibility determination was also flawed in other areas. For example, the judge cited to the letters submitted by an applicant to corroborate her claims from her father and her boyfriend. The judge focused on the fact that the father wrote in the letter, your problems arose from early marriage, early pregnancy. The judge speculated as to what the meaning might be of those words and those terms. And as this Court has frequently recognized, the process of translation is one that can give rise to miscommunication and mistranslations. Similarly, if you look at the... Who has the responsibility for translating this? The responsibility lay on the petitioner to find someone to adequately translate. The issue here, I'm not saying that the translation was incompetent. The very nature of translation, though, is problematic. If you try and do a word-for-word translation from one language into the other, it is more likely than not, actually, that the translation will fail to capture context, colloquialisms, and actually may oftentimes give rise to more misunderstanding. It's the nature of the beast, Your Honor. Okay. Counsel, at this point, then, what should the I.J. do? Because you've introduced this letter with your translation, and the I.J. You're asking the I.J. to accept it and to read it in ordinary English. And if it's been mistranslated but didn't accurately reflect colloquialisms, what's the I.J. supposed to do with it? You didn't have to submit the letter, but you did submit the letter. And once you do, doesn't the I.J. have to read it? Of course, Your Honor. But at the same time, early marriage, that can be read or interpreted in a number of different ways. The judge chose to interpret it in her... injecting her own personal speculation as to what was meant by those two words, early marriage. So country reports indicate that people who are underage are not allowed to contract a legally binding marriage in China, which is what the petitioner testified to. She was underage and was not allowed to legally marry her boyfriend, her fiancé. Therefore, we would submit that the words early marriage, the translation, does not necessarily infer that it had to mean that they were married legally early. You can read it that way. Alternatively, it could be read that, yes, you had a problem with the government because you tried to get married too early. And there's no contradiction there, Your Honor. It doesn't make any reference to the word abortion. What's your explanation? Neither of the letters mentions abortion. No, Your Honor, you're right. But the letter does say the word early pregnancy. It is well-documented in the country of China. A pregnancy that is begun before the proper legal age, or if you are not legally married, is not permissible. So early pregnancy, because do we – this Court, I don't believe in its long line of cases, has never inferred that we must have these magic words. So I would also submit, Your Honor, that if someone were to come into court with corroborative documents that parroted, wrote words from their own declaration, in fact, a reasonable fact finder would look at that and suspect the authenticity of that document. So it's kind of a catch-22, Your Honor. With regard to the rest of the immigration judge's adverse credibility determination, as far as – What about the certificate of abortion, which the IJ read the country report to say is only issued in the case of voluntary abortions? Again, Your Honor, I would submit that the Department of State actually says on page 24 they are not aware of any of these abortion certificates being submitted in the case of a forced abortion. Now, not being aware of it doesn't mean that it doesn't exist. Do you have any authority for that? Your Honor, I would submit that it's a common – that's a logical – it's a logical reading, and I would submit I believe this Court has also held similarly in the case of Zhang, Z-H-E-N-G, a recent case, so. I was sort of surprised that we had to tell you both about that. Go ahead. Thank you, Your Honor. So moving forward, the other issues in the credibility determination are similarly problematic. With regard to the brother who came forward and testified at the hearing, by his own testimony, he wasn't in China at the time that these events transpired. So the immigration judge was basically submitting her personal speculation as to what a brother and sister might discuss on the phone, assuming that they would discuss a lot of personal details, where maybe that's not the case. Again, a substitution of conjecture and speculation. Why was the brother called? Was that under some push from the immigration judge or the government to have a witness? I believe, Your Honor, there was some inquiry at one of the prior hearings. It's an interesting conundrum, Your Honor. On one hand, you know, we do have this case where it says an applicant, you know, when they're fleeing their country of persecution, the circumstances under which they're fleeing, they may not have time to gather up a million and one affidavits and declarations and things like that. We understand that. The question is why in this case? But an applicant in court, Your Honor, is often faced with a judge who says, you know, I want to see some witnesses. Do you have family members there? I'm not asking about often. I'm asking about this case. In this case, Your Honor, I do believe there was an inquiry as to which may have compelled the applicant to believe that she had to appear with a witness. I'm just looking for what is on the record. I saw some reference in the byplay in the hearing where the idea was asking about a witness and was there going to be a witness and so on. Okay. So at any rate, Your Honor, the brother wasn't present in China. It's perfectly reasonable that he wouldn't know about any of the things that had occurred. So we would submit that that is also, again, another ground, another reason why the opinion is flawed. Finally, with regard to the difference in the asylum application and as to whether or not she was working or not working in Guangxi, Your Honor, I believe that this is a minor inconsistency. And the reason is it's on the same application. It indicates she was living at an uncertain address in Guangxi. The heart of the claim is that after she was forced to undergo the abortion, the government was trying to pressure her to have this IUD inserted, fearing of that she fled to Guangxi. So one way or the other, either way you cut it, Your Honor, she was in Guangxi. So as far as I'm concerned, Your Honor, the issue of whether or not she was working as a salesgirl, it doesn't go to the heart of her claim. That's number one. With regard to you can take it another way, Your Honor. I'll go ahead and attack it from another point. Well, if you think of it, I'll give you some time for rebuttal. Thank you so much, Your Honor. Counsel, just one question. She has two children who are now U.S. citizens and a husband who is a lawful permanent resident. Is that right? He was a lawful permanent resident. I believe he's a U.S. citizen now, Your Honor. Okay. Does she have any additional claims before the Attorney General in order to be able to stay here? She did file a motion to reopen, a motion to remand to reopen based upon future persecution due to her additional U.S. children. So the government's position at this juncture is that it's speculative. However, we would submit, Your Honor, it's entirely consistent with the country conditions as we know it in China. Clearly, no matter whether she's already had the children, not had the children, is not really what the Chinese government, based on country conditions, is looking into. Are you a childbearing woman who's going to cause us to overflow our population? That's the issue. So the fact that she's already gone ahead and gone abroad and had more children actually would seem to indicate that she is somebody who has the inclination to continue to bear children, thereby making the government more likely to go ahead and want to sterilize her and or submit her to the IUD. Good morning, Your Honors. Nora Escaliche-Forsberg, Respondent, Alberto Gonzalez. I'll work backwards and start with your question, which is, now, according to the record before this Court, she is married to a person, to a Chinese national who has been And if, in fact, she has adjusted, the remedy is that she goes before the he files an application for a visa for her, a visa petition, and she moves to reopen before the Board. That's simple. But that's not before the Court. That's an alternate means of relief. And nothing we do here today would foreclose that? Absolutely not. Even if she has a final, well, now she has a final order of removal. It's pending before the Court, but right now it's still a final order of removal. If you enter a final order of removal, she can still go back, and DHS can join in the motion, or she can ask the Board, and the Board can reopen to allow her to adjust status. So there is an alternate means for her to remain in the country, but that's not before the Court today. What's before the Court today is Do you have any sense as to how likely that is? Generally, when there's been a visa petition granted and, well, approved, DHS routinely, if there's no crime, DHS routinely concurs in reopening. They're reopened and granted. It's a matter of, they're not mean people. There is a humanitarian effort there, and they are happy under the statute as it is written to go along with whatever relief is available. Under the statute as it is written and applied to this case, there's no asylum. Eligibility has not been established. What counsel said in answer to her question, which is what effect the two USC children have, they have absolutely no effect on her asylum claim. There's nothing in the record to indicate what China, how China evaluates children who are not in China. The fact that she's had two United States citizen children that are, she doesn't say she's going to be going back to China with if she goes back. The fact is, in China, she has no children. So that is, cannot be a basis. I was a little puzzled by sort of almost heartlessness in saying, there's no way the Chinese government needs to know about your two children, which assumes that the two children are being left in the United States. But that was, that seems to be the assumed state of the record, that she can't take those children with her. It's not a question of not taking. She has said nothing about it. It is her burden to establish. That's what I'm now trying to, you're clarifying for me. It wasn't being, it's not a hostile observation. I get a little excited, I'm sorry. But the point is, on the record, what she has, the board said it inartfully and perhaps sounded unsympathetic. But the fact is, there is no evidence that China will regard, charge two children in the United States who are not Chinese citizens, who are United States citizens, will charge them against her in the birth control evaluation, that will they count as Chinese children for the purpose of Chinese family planning purposes. And there's no evidence nor reason why they should. And the evidence must compel that. It has no effect on the Chinese family planning, the fact that there are two children in the United States. So there is no well-founded fear of persecution established on the fact that she has two United States citizen children. What about going now to the Zhang case, which analyzed the same country report? Well. And found the same ambiguities that are being argued for here. Okay, well, there are ambiguities. And Zhang, I don't think, changed anything. It just clarified the fact that State Department reports can be considered. They cannot contradict specific testimony, but they can certainly be considered in evaluating the testimony. Well, that's how they were used in Zhang. The IJ said, well, you're found inconsistencies based on the country report. And Zhang spelled out in some detail that the State Department doesn't profess, by its own terms, to rule out all variables. And in this case, her testimony lines up pretty well with the same as Zhang, an underage husband and wife, and so on. In this case, the immigration judge absolutely did rely on country reports, but he also relied on specific material inconsistencies and failure of proof.    And what is going to make a big difference for any Tennessee felon. Because the issue here Which for what? And which differed from Zhang? Okay. It does differ from Zhang. First of all, she comes to the United States, on a Japanese passport, and does not ask for asylum. She does not claim that she's fleeing persecution. She does not claim that she fears persecution. She says, I have come to work and study. Only afterwards does she say, I was persecuted. I will be persecuted. Now, remember, her brother has asylum here. She's not unfamiliar with the process. He's in touch with the family. The family sends the documentation to him. He brings it over. He's called as a witness. There was no pressure to call him as a witness. The immigration judge said, at best, do you have a brother here in the United States who's been granted asylum? Are you going to call him? It was nothing more than that. So, but he came. She produces him as a witness. And he does nothing. He knows absolutely nothing about her claim, nothing about whether she was pregnant, nothing about whether she was aborted. Well, he knows something about there were problems having to do with the pregnancy. No. He only knew that she had paid $43,000 to come to the United States. She said there was some he said there was some woman stuff. That's as specific as he got. But that does not compel the conclusion that the events happened as she described them in one way. But the point is he did nothing to help her claim. The father's letter contradicted her claim and some of her testimony. She testified at one point, I was married in a ceremony. Her father writes, we had problems because of early marriage. There's no interpretation or speculation there. Wait, wait, wait. What's the inconsistency there? Well, then she says she wasn't married. You said she was. She testified first that she was married. Married. Her father said, absolutely, she was married. Early marriage, you know, despite what counsel says now. And she never challenged the translation. And, in fact, it was her translation. Well, that was the same thing in Jean. They were married. The marriage wasn't recognized. But she says that she, but then she says she wasn't married. She was just engaged. It doesn't matter the interpretation. It matters the fact that she changes her testimony materially to say, yes, I was involved in a marriage ceremony. Dad says, yes, she was married. And then at another point in her testimony, she says, no, I wasn't married. I was engaged. That's an inconsistency. That goes to credibility. That goes to the heart of marriage, because if she's not married, she hasn't violated the family planning policies for underage marriage. Now, the question is, was, first of all, was there an abortion? And, second of all, if she had an abortion, was it voluntary? It is entirely possible that she was pregnant and she had an abortion. But just because you're in China, terminating a pregnancy doesn't mean that it's coerced, forced, or dragged off. It's grieving to have it done. Young girls all over the world choose to terminate pregnancies because they're too young. They're not ready. They're not ready to start a family and be responsible for a child. It does not, if she had an abortion, if that can be believed, it is, the record does not compel that it was forcibly terminated. And, in fact, and this is where the country reports come in, it doesn't compel the conclusion that an abortion certificate means that it was voluntary. But then you get into the third major material inconsistency that goes to the heart of the matter, and that's whether she was working or not. And the reason it goes to the heart of the matter is because she said in her asylum application very clearly, I was working as a sales clerk in Guangxi when I was there. Her boyfriend, in the letter he wrote, which also doesn't help very much, says she was working as a hat maker. They're not, you know, she was working. I don't care if she was selling hats or making them. But the point is you have two pieces of evidence that say she was working in Guangxi. The reason it goes to the heart of the matter is twofold. One, because she said she fled to Guangxi to stay away out of the eye of the Chinese government. And when she was asked, but what did you say? But in your application you said you were working. She didn't deny it. She didn't say that was a mistake. She said, how could I have been working? I was trying to stay out of the public eye. I was in hiding. I couldn't have been working. That is why it is material and goes to the heart of the matter. Furthermore, as a secondary ancillary point on that issue, she also says then it corroborates what the country reports say, which is abortion certificates are issued when a voluntary abortion is performed because then you can't get two weeks off of work. That's consistent with the State Department reports that if she had an abortion, it was voluntary because she had the certificate. If she was working, she got the two weeks off. So that's where she's not inconsistent with the State Department reports. The fact that they say these things occur, it probably, if she had an abortion, it supports the fact that it was voluntary. She hasn't established then past persecution. No rebuttable presumption arises. If it arises, as the Board properly found, she hasn't established that she has a well-founded fear of persecution. She's had two hearings before an immigration judge, three hearings before the Board. She's had a lot of due process. There is no evidence which compels the finding that she was persecuted in the past or has a well-founded fear of persecution. Thank you, Your Honors. Thank you. Petitioner would respectfully submit that she has, in fact, established prima facie eligibility for asylum and withholding of removal, certainly based upon a forced abortion and the threat and coercive insertion of the IUD in the future under Wong. The only basis to go ahead and say that she hasn't is if you will follow along with the adverse credibility finding. And again, we would submit that it's completely flawed. With regard to the country reports, we would ask the Court to continue to apply its holding in Xiong. And we believe that's the correct application of the law. With regard to the working or not, again, this is a statement that is susceptible of many meanings in terms of working. Hiding versus working? Your Honor, for example, if someone's in hiding and they take piecework and they're working, they're not working in a factory. Well, but that's not at least the way the testimony was characterized. Did you disagree with the characterization of the testimony that she says, how could I be working when I was in hiding? Your Honor, how could I be working properly? How could I be legally working if I was in hiding? There's no such thing. Do you have the transcript reference to where that was? If you don't, we can find it. Okay. Go ahead. Finish your thought. Yes, Your Honor. And, again, this Court has recognized in Lee v. Ashcroft the inherent unreliability of the statements taken at the airport. When people come here to the airport, the circumstances under which they've arrived, the circumstances lend themselves to all kinds of things happening. So you cannot rely on that to impeach her testimony. Finally, with regard to voluntary abortion versus involuntary abortion, she testified it was a forced abortion. So now for the IJ to go ahead and use a generalized statement in the profile, it shouldn't be permitted under this Court's holding, Your Honor. Okay. Thank you. 226-227. Thank you. All right. Counsel, both, thank you. The case just argued is submitted. Okay. Go through? Yes. All right. The next case on calendar, then, is Soto-Armenta v. Gonzalez. This guy, Gonzalez, is really getting in a lot of trouble, isn't he? I wonder if he knew that when he decided to get confirmed.
judges: Browning, Fisher, Bybee